v. Banco De Los Trabajadores, Mr. Shanigan. Yes, that's correct. Thank you, Judge Hall. Canon Shanmugam of Williams and Connolly for the appellant, Banco De Los Trabajadores, or BANTRAB. May it please the Court, in this case, the District Court committed two basic errors resulting in a multi-million dollar verdict against one of Guatemala's largest banks, BANTRAB, for alleged breaches of contract in connection with two financial transactions. As to the first transaction, the debt issuance, the District Court erred in permitting the plaintiff, Quantum Capital, to introduce evidence regarding the work that its sole member, Oswaldo Hugo, allegedly undertook for BANTRAB while associated with companies other than Quantum. No, there was a claim, to be sure, in Hugo's own testimony that there was, in fact, an oral contract, which is to say, and actually, just to be clear, Judge Rustani, I don't think it's so much a question of whether he was affiliated with Quantum, it was, of course, a question of whether he was doing work for Quantum. Quantum Capital, I believe, existed as an entity at the time. That's my question. Yes, and the claim is that during the time period prior to 2011, Hugo did testify that there was allegedly an oral contract, but the uncontroverted documentary evidence indicated that during that time period, BANTRAB did not have a relationship with Quantum Capital. BANTRAB had an exclusive relationship with another entity, Activa, during much of the relevant time period prior to BANTRAB's entering into the written contract with Quantum Capital in 2011. And indeed, Quantum itself, in the arguments on the motion for judgment as a matter of law, essentially conceded that the only thing that it was pursuing a claim on was the conduct after the written contract was executed. And that's really why this evidentiary ruling, I think, was sort of doubly flawed. Not only did Judge Ungaro permit the introduction of testimony for work that Hugo performed for other entities, she permitted the introduction of testimony that was really ultimately completely irrelevant because it was testimony that predated the written contract. Isn't that what the dispute is about? I mean, was this work done for Quantum or was it done for somebody else? And doesn't Mr. Hugo then testify it was done on behalf of Quantum? Judge Rastani, the dispute was, of course, about whether Quantum performed its obligations under the contract. And Quantum, of course, was the plaintiff, and Quantum was the party to that contract. And indeed, I think after having ruled definitively and unambiguously in Lemonet that evidence of work that Hugo performed on behalf of these other entities could be admitted, Judge Ungaro throughout the proceedings, and in particular on the arguments on the motion for judgment as a matter of law, expressed really the same concern that we're raising here. She said that the evidence is, quote, thin regarding Quantum's involvement. That's at pages 577 to 578 of the record, and that's item 318 on the docket. She said that this is the confusing thing about the case, whether Hugo is claiming he's entitled to be compensated for the efforts he made while he was associated with other companies or not. That's at pages 667 to 668. And ultimately on page 668, Judge Ungaro said, this is not something that can just be glossed over. This is the problem of the lawsuit. And then finally at pages 683 to 684, Judge Ungaro said that Quantum's real argument was that, quote, I am Oswaldo Hugo, and I am entitled to everything I've done from the beginning of time. And I think notwithstanding the fact that Judge Ungaro herself recognized that this was, quote, the confusing thing about this case and that there was a very real risk of confusion, she permitted the evidence to be admitted in limine and then declined to grant judgment as a matter of law. And we would respectfully submit that not only did she err with regard to her evidentiary ruling, she really should have granted judgment as a matter of law, because if you take a look at the uncontroverted record here, the evidence that anyone performed anything after Quantum and Bontrab entered into the contract in 2011 was remarkably thin and certainly not sufficient for a reasonable jury to find breach of contract. If you take a look at Hugo's own testimony about what he did starting in 2011 and up to 2013, the only work that he claimed to have performed during the time period when he was acting for Quantum consisted of sending these sporadic e-mails to a Deutsche Bank employee that primarily just concerned general market conditions. And it's really undisputed on this record that in 2013, in the time period when Bontrab and Deutsche Bank were in negotiations concerning the debt issuance, Quantum did nothing regarding the transaction's negotiation or structure or execution. And those were really Quantum's primary obligations under the contract. The contract is quite short. It's Plaintiff's Exhibit 1. And if you take a look at the very first page, it sets out the services to be rendered. And those services were not surprisingly primarily to aid Bontrab in negotiating and structuring the proposed debt transaction. And I think what really happened here, and I would really invite the court to read Hugo's testimony, because this was a relatively short trial. There was really only one live witness on each side. And if you read Hugo's testimony, I would respectfully submit that you will come away with the very same confusion that Judge Angaro did about what Hugo was doing for whom when. And you will also come away with a sense that there are lengthy swathes of the testimony that really were ultimately irrelevant because they predated this written contract. And so I think it is not surprising that the jury was ultimately quite confused and therefore reached an erroneous result given the record, which again was very thin, on the question of actual performance by quantum of its contractual obligations. And I would say that with regard to the primary argument that my friend Mr. Bellows makes here, that there was somehow a waiver. That number one, our motion in Lemonet was quite clear concerning the evidence that we were seeking to exclude. I would refer the court to Record 164 at page 10 where it makes quite clear that we're seeking to exclude any evidence regarding the work that Hugo performed on behalf of certain enumerated entities, the entities with whom Bontra did have a relationship prior to 2011, and that the district court ruled definitively on this in her written order on the motion in Lemonet, and that's Record Item 211 at pages 4 and 8. And so again, our submission is really twofold with regard to the debt issuance. It's that at a minimum we should be entitled to a new trial because the district court should have granted the motion in Lemonet, which would have considerably streamlined and clarified the evidence that was presented and really effectively limited Hugo to testifying to the post-written contract conduct that was concededly performed on behalf of quantum. And that second, we would respectfully submit that the court should in fact go further and reverse the denial of our motion for judgment as a matter of law, because when the irrelevant testimony is stripped away, you're really left with very little evidence that quantum in fact did anything, and certainly not enough evidence to rise to the level of substantial performance of its contractual obligation. And I do want to say a word about the second issue in the case, which of course concerns the other count on which the jury found liability count 4 and the securities sale. On that count, our argument is a purely legal argument. It's an argument that the district court should have granted Bontraub's motion for summary judgment on quantum's claim of breach of the alleged oral contract, because that contract was in our view void and unenforceable as a matter of Florida law. And that's on the ground that quantum should have registered as a dealer of securities for purposes of the Florida Securities Act. This discussion concerns an exemption in the Florida Securities Act. It's the exemption that's found in section 517.061, parentheses 8 of the Florida statutes, for transactions that involve the sale from one corporation to another corporation. In our view, the district court erred in concluding that that language unambiguously exempts transactions involving foreign corporations as well as domestic corporations. The Florida Securities Act itself does not define the term corporation. And although Appley does not acknowledge this, there is Florida law as there is on the federal level that stands for the proposition that exemptions from registration requirements should be construed narrowly rather than broadly. There is also no case law in Florida on the meaning of corporation in this exemption. In our view, the better view is that corporations should be limited to domestic corporations as it is in the definition of corporation in the Florida Business Corporation Act, which after all is the statute that governs business relations in the state of Florida. And again, that's really not because that definition is binding, but because that definition we think applies in analogous circumstances and should apply here, particularly given the background principle that exemptions should be construed narrowly. And as we point out in addition in our brief, there are other circumstances in which the Florida Securities Act makes clear when it intends to sweep beyond mere domestic corporations. And so again, while there's not a definition of corporation in that statute, we believe that all of these can be used. It also doesn't say domestic corporation or foreign corporation, so why shouldn't we construe it to include both? Well, it doesn't, but of course that's true in the Business Corporation Act as well, and that's a context in which the Business Corporation Act uses corporation to apply only to domestic corporations, and we think that, Judge Hall, there are good policy reasons why the Florida legislature may very well have wanted to limit this exemption to... What is your best Florida case? Because it is a matter of Florida law. So there really are no Florida cases. There are no Florida cases. Even though the statute has been on the books for several decades. And so certainly I do think that it would be appropriate if the court thought that this was an ambiguous question and it wanted the benefit of the Florida courts to certify this question to the Florida Supreme Court for its guidance. But I do think that, again, all of these cues in our view point in favor of our interpretation, and we certainly think that as a matter of policy, again, the Florida legislature could certainly reasonably have concluded that it wanted to create an exemption for transactions involving in-state corporations, which are of course themselves separately regulated and separately subject to the jurisdiction of the Florida courts, but not to extend that exemption to transactions like this one that involve foreign corporations, in this case a Guatemalan entity and a Panamanian entity that are not only foreign corporations but aren't even registered to do business in the state of Florida. Unless the court has any further questions, I think I'll reserve the balance of my time for rebuttal. You have done so. Anything from the panel? Thank you, sir. Thank you. Mr. Bellows. May it please the court, Christopher Bellows on behalf of the Appellee Quantum Capital. I want to start with the motion in limine, which appellants, that's their first point, is the motion in limine. The judge said in responding or ordering on the motion in limine, he said you didn't even object to any specific evidence. I don't know what evidence you want me to limit. So she denies it. The judge denies it because they haven't objected to anything specifically. Now jump forward to the pretrial stip, which the judge has said is the roadmap for the trial. The pretrial stip is docket entry 226. If you look at that, not only does BANTRAB, the bank, stipulate to what they say is the non-party evidence, but if you go to the actual exhibits, in their brief, the only evidence that they complain about in their brief is evidence as to new continent finance. If you go to their pretrial stip, they stipulate to the evidence on new continent finance. I thought there was a temporal claim here that there was no way he could be paid prior to the execution of the 2011 contract for which he was seeking a breach. There was a temporal limitation about the evidence that everybody was aware of, I thought, that anything prior to September 2011 shouldn't be admitted. Am I wrong about that? They have said that in their brief, but if you go to the pretrial stip exhibit, to our exhibit list. Anyway, there was a lot of evidence about his activities and work prior to 2011, right? Correct. Okay, in fact, that was the bulk of the evidence at trial. Much of the evidence at trial was as to pre-, really starting in late 2008, 2009, but you have- And so how can you recover for work you did before the contract was ever executed? And it was a lot for other companies. It seems to me there's a serious problem on that part. I'm not as much worried about the securities transaction. So if you go to docket entry 367-5, that is an email from BANTRAB, that's in 2009, early 2009, where they specifically identify the bond deal and the capital deal and the fact that it's Quantum that's going to be doing that work. So Quantum is doing that work under an arrangement that is eventually memorialized in 2011. So there's nothing in the contract that says- Who says that? Who at trial said that? Quantum's principal, Mr. Hugo. He said that a significant amount of work was being done by Quantum to put the bond deal together and then later the capital deal together. So the contract is not- the contract is retrospective and prospective. Does the contract itself say that? The contract doesn't say that you don't get credit for all the work you've done already. No, does it say we're going to pay you for the work you've done prior to the execution of the contract? The contract says you- No, it doesn't say that. You're going to get paid for the work you did prior? The contract is silent on that. So that's really a jury issue. I mean, there's no unambiguous phrase in there that says you don't get credit for any work that you've been doing for the last two years. So the jury is presented with the fact that BANTRAB has emailed clearly documents to Quantum that specify Quantum, that specify the bond deal, that specify the capital deal. That starts in 2009, a significant amount of work. The guts of the testimony is pages 190 through 340 of the transcript of everything that Quantum did over a period of five years. You have- and the testimony is that BANTRAB just took a long time to sign documents. And they took a long time to finally sign this contract, but they signed it in 2011. It doesn't say that all the work that you did, it vanishes into the ether. I mean, just like the briefs that we wrote, they don't vanish into the ether. I mean, it's work that continues to percolate. It's work that still survives. And it's work with Deutsche Bank. It's relationships with Deutsche Bank, other entities. But the connections that were made over time are still alive, that are still in play. So starting in 2011, and the judge, during the directed verdict motions, walks BANTRAB through the problems with their case, takes the contract. Says that if you lock me out, if you terminate me and the deal closes, you have to pay me. So we know that happened. We know that they locked him out at the very end. The contract part two says, as long as the deal closes, you're entitled to payment. So you don't really need to even worry about all the testimony about pre-2009, post-2011. If the deal closes after we terminate you, you get paid.  That's one basis to sustain the verdict. The other basis is, and the judge took BANTRAB through this, your witness has testified that quantum has performed under the contract, at least as did the first two prongs of the contract. The jury could find that that was substantial performance. The jury could find that those two first things in the contract, A and B, were so significant and so essential that that constitutes substantial performance. Their witness testifies to that. A lot of that work was pre-2011. So your own witness is telling the jury that pre-2011, because we know you retained quantum back in 2009, the BANTRAB's own witness is telling them that all of that work counts. You get credit for all of that work. So then the judge takes BANTRAB through each section of the contract and basically says you're in trouble because you've got A and B, which your witness says has been performed. You've got C, D, and E. At a very minimum, you locked quantum out of that. So if you locked them out, they're excused from performing that. And then you go to F in the contract. F is such other financial advisory services as may be agreed upon by quantum and BANTRAB. And that's when the judge says, over the course of time, listen, I'm starting to understand now that quantum could not make this bond deal happen until you had money, you needed capital, you had no capital. So I've got emails from BANTRAB to quantum saying, listen, we can't do the bond deal unless you get us that capital from DHK. Because just think about it with an equity line on your house. If you don't have equity in your house, you can't get a loan. BANTRAB could not get this loan from Deutsche Bank or whoever it was going to be. It ended up being Deutsche Bank. BANTRAB could not get this loan until it had the capital. And you have, and this is all post-2011, you have substantial evidence that BANTRAB was pushing quantum to get this whole thing done. But to get the whole thing done, you needed to have the capital. And that's undisputed. And the judge pointed that out. It was all interdependent. It all worked together. So the jury can take the fact that their witnesses said, OK, they performed A and B. We know that they made this thing happen by getting the capital. And C, D, and E, you have in the testimony that you have in the evidence that BANTRAB sent the offering memorandum, sent the engagement letter to quantum early on, back in 2009. The jury has 115 exhibits over the course of time from 2009 to 2013 when the bond deal finally closes. The jury sees the deal as it evolves over time. And the jury knows that everything that quantum did is the final result. They can look at the documents and see that the offering memorandum is exactly the same, that the engagement letter is exactly the same. And these are the things that quantum was involved with. So all of the documents, all of the bond documents that quantum was involved with are the ultimate documents for the most part. So on different levels, you can come at it in so many different ways to sustain the jury's verdict. Can I ask a question about the motion in Limine? I take, as I read the judge's opinion, she said, basically, you haven't told me exactly what it is you want excluded. So your view is the ruling on the motion in Limine wasn't a final ruling because they had the option of showing, of making an objection to exact evidence. Right. It wasn't definitive. You have to object during trial. And then, this is. Yeah, you don't have to object if it's definitive, but you said, but I take it, your view is because she said, I'm basing this on the fact that I don't know exactly what it is you want excluded. Exactly, Judge. That makes it not definitive in your view. In my view, yes. But there's one other thing. And again, this is what happens when you prepare for oral argument. I talked about in my brief how they stipulated the evidence, but they took it a step further. In the pretrial step, as to all these exhibits that go to these issues, they say, no objection, no objection, no objection. So that's the equivalent of standing up in trial and saying, Judge, we have no objection. So those are exhibits that they would say Mr. Hugo did in relationship to entities that weren't quantum. Correct, correct. I see what you're saying. Again, so if you go to their brief, the only thing that they argue about is new content finance. If you look at the pages that they cite to, and the exhibits that are in play at that moment in time in the trial, then go to their pretrial step. Not only did they stipulate to the evidence, but they say no objection. I mean, that's appellate law 101. If you get up in the middle of, if you get up in trial and say no objection, you can't appeal that. OK, I'm just not sure who's on first in this case. But it's not your fault, it's my fault. Eliminate motion goes to the first contract, right? Eliminate motion goes to the bond. The bond, OK. And for the DHK, let me jump to that, because that's a quick argument. I think DHK, is that only the corporation argument, or is there more? No, that's the exemption argument. So let me just jump on that real quickly. For DHK, is the exemption, and what corporation means? OK, so that's the only thing that we're looking at with regard to that transaction. And can I take care of that real quickly? OK, if you look at the exemption, the exemption has nothing to do about where the corporation's from, 517-0618. The exemption has to do with whether you're a big corporation, whether you have a lot of money. That's why it says corporation, but the corporation has to have over $500,000, and the securities in play have to be a lot of money, and it has to be a big corporation. So it's like a big person exception. It's not where you're from, it's how much money you have. It's common sense. In your view, it's whether you're a little person who needs protection. Correct, correct. And again, the legislature knows how to differentiate between foreign corporation and domestic corporation, because they did so in the chapter that they're relying on. They're relying on 607. Well, in 607, they differentiate all the time between foreign and domestic. Here they don't, because that's not what this is about. It's the little person versus the big person. The sufficiency is you've performed substantially. The jury has testimony from Bantrap that they've performed. The jury could rely on that and say that's substantial performance, or part of the instruction was, or you were excused, and there's abundant evidence that you got locked out. You have part two, which allows you to recover as long as the deal closes after you've been terminated. And then you have, again, from pages 190 to 340, the whole range of work that was done over time, and then this capital that made the bond deal happen. So on three different ways, you sustain the verdict on sufficiency of the evidence. Unless the panel has any more questions, I'll rest. I have a question back to the debt issuance transaction. I'm looking at what the contract required Quantum to do. Right. And to introduce them to other investors who might be interested, a system and strategy and tactics for negotiating, a system in negotiating the definitive agreements, and so forth. Anyway, so I know you claim all the work prior to the entry of the contract, but I want to make sure I understand the record evidence as to post-entry of the contract, what Mr. Hugo said he did. So did he get involved in negotiating? Did he negotiate after the execution of the contract? Or am I correct, he didn't talk to anybody, really? No, he was continuing to talk to Deutsche Bank. I mean, the person at Deutsche Bank was his friend, and they were in contact every 15 days. So from 2011 all the way until the time they said, listen, we're not going to pay you for the bond deal, get out of here. He was in contact with Deutsche Bank. He was communicating with them. And Deutsche Bank was the underwriter on the bond deal? Yes, Judge. Okay. All right. Did he introduce Bontrabe to other investors during that period of time? During that period of time, I think he was trying to make connections on the bond deal, but they told him to work on the capital, get the capital done. So you did have, again, Deutsche Bank. No, but they're not talking about another transaction. They're talking about this transaction. Right. I understand your argument is that his claim is that he had to work on the security sale in order to have the financing. To make the bond deal happen. That was clear. Obviously, they don't agree with that. That's a disputed issue of fact. That's what you put on evidence of. Correct. Judge Hall, I don't know if this is going to make it any easier for you, but their own witness, their own witness, because there is an issue, and I think this is a jury issue, do you get credit for the work that you did before they actually signed since they've been doing work for two or three years? Their own witness said on A and B about seeking to introduce, familiarizing yourself, their own witness said, yeah, they did that. That's Mr. Liu. Mr. Liu. So once their witness says that that counts, then it counts. And a lot of that work was pre-2009. In fact, the introduction, you can't keep reintroducing. Once their witness says that counts, then the jury is told that it counts. And there's nothing in the contract that says that it doesn't count, that the work that you did just disappears. I mean, it still is there. It's what they're relying on. You go to the offering memo, the engagement letter that was back in 2009. They're just virtually the same documents that get signed. So the jury had everything in front of them. It's an issue of fact. And the jury believed us. They didn't have a witness with knowledge of the transaction. I'm just trying to understand the evidence. But he also testified that his contact with Deutsche Bank in 2011 to 2013 was about the securities transaction, really not about the debt issuance. No, also the debt, because Deutsche was going to do both the debt and the capital. So I mean, they were going to do both. And then Deutsche was too expensive to do the capital, so they stayed with DHK. But they're talking about the whole pot, because again, Deutsche can't do the bond unless there's capital. So Deutsche was talking about doing both. OK. Any other questions? I don't have any, Judge Fahy. OK. Thank you. Thank you, sir. Mr. Schamagen, you reserved your full three minutes. Thank you, Judge Hall. And the . . . Why isn't it a disputed issue of fact as to whether all this work done on the securities transaction was basically necessary to get the bond transaction going? I know you dispute that, but he puts on evidence. Isn't that just a disputed issue of fact? I don't think that there is valid evidence for that proposition. But even if there were, Judge Rustani, the critical point is that that . . . Hugo didn't testify that that transaction needed to go forward? I think that he certainly testified that that transaction was going on at the same time. But I don't think that his testimony indicates that that transaction had to be performed as a prerequisite. And at least I don't think that that's the best reading of his testimony. And even if it were, I don't think that it would excuse the failure to perform. And so I want to go to the heart of what Mr. Bellows has argued with regard to the debt issuance, again in my limited time, because I think it's critical for the court to understand this. Mr. Bellows, time and again in his argument today, relied on this notion that there was an oral agreement in 2008 and that the written agreement essentially swept backward and covered any work that was done during that time period. The argument of Quantum's appellate counsel today is flatly inconsistent with the argument of Quantum's trial counsel in the exchange with Judge Ungaro. Judge Ungaro raised this very issue in the argument on the renewed motion for judgment as a matter of law. And if there's one thing in the record I would urge the court to look at, it's that exchange. It's in volume two of our appendix at pages 673 to 674. And in the course of that exchange, the court pressed Mr. Encinosa, Quantum's trial counsel, on whether Hugo wants, quote, credit for all the work he did during this time period while he was associated with these other companies. And Mr. Encinosa responded, no, your honor. Quote, that is not part of our case. We're not suing here for any of this work. And that, I believe, has been clear in our presentation. We've tried to make that clear in our presentation, and it's consistent with the testimony. We are not suing based on this contract, meaning the alleged prior oral contract. We're saying that through this entire period any work done was related to that contract only, and Quantum is not seeking anything for that. For this period here as well, Quantum is not seeking anything with respect to that. The July 25, 2011 contract, if I may, your honor, this is the contract that we're suing under. This is pages 673 to 674 of record 319. And this is the oral argument on the renewed motion to dismiss. And that was, of course. You said it was a certain page of volume two of your appendix. Oh, yes. No, it's a volume two of our appendix at the tab for DE, docket entry 319. I don't know how I find that. It's pages 31 and 32 of the ECF entry for that volume. So again, pages 673 to 674 of the transcript. And I think this is critically important, because it explains why all of this prior evidence really should not have come in. And I think if you take a look at the contract itself, as Judge Hull suggested, there's nothing in the contract itself that suggests that it sweeps backward. If anything, if you take a look at page two of the contract, it makes clear that the engagement is effective only as of August 22, 2011. And if you look at the way in which PONTM is being paid, there is a retainer fee going forward and then a success fee. And so really, the district court's fundamental error was in not knocking all of that off the table. And again, all you're left with after 2011 is not very much, as Judge Hull's colloquy with Mr. Bellows made clear. And to the extent that Mr. Bellows primarily relied on the Lew email, I would point the court to page 10, footnote three of our reply brief, where we point out first that at most, that email concerns the kind of preliminary obligations in subparts A and B of the contract. Performance of those obligations, in our view, would not be enough to constitute substantial performance of the contract. But in any event, it was quite clear that what Lew was talking about was work that Hugo performed on behalf of other companies and not Quantum. And so certainly, to the extent that Hugo did perform work in introducing von Traub to Deutsche Bank, that should not have been taken into account because it was work that was conceitedly not performed for Quantum. And indeed, I would point the court one more time to pages 349 to 350 of the transcript, that's record 317, where Hugo conceded that during the relevant time period, there was, in fact, a contract, an exclusive contract, between von Traub and another company. And therefore, that work could not have been performed on behalf of Quantum. And I think for that reason, again, that evidence should not come into the calculus. And when Mr. Bellows was asked by Judge Hall, what Mr. Hugo had done after 2011, all he could do was to refer to the fact that there was communication every 15 days between Mr. Hugo and someone at Deutsche Bank. That comes far short of constituting actual performance. But the contract had a flat fee of 1.5, right? So we're not talking about the amount of money. We're just talking about whether or not he performed the contract to trigger the payment. Yes, that is correct. That's all we're talking about. And we're talking about whether the jury was prejudiced in deciding that issue by hearing all the pre-contract work. Yes. Is that basically where we are? That's right. And at a minimum, Judge Hall, even if you were to disagree with me on the relevance of the pre-2011 work, and again, I really think that because that work was performed prior to the entry of the contract and because it was plainly performed on behalf of other entities, it was irrelevant. At a minimum, there was certainly a risk of confusion. And the district court itself recognized that risk of confusion when it said that Quantum's case is, quote, very confusing because of all these different appropriations that came in. I have to stop you. Your time has expired. Thank you very much, Judge. We would ask that the judgment be reversed, or at a minimum, the case be remanded for a new trial. Thank you. Thank you, sir. The court will be in recess. Brian, I don't have the appendices for this last case available if you could. Yeah, can you just see if you can find? Yeah, right. So I'm going to read her. We'll go on back, and you can just bring them on back. That's great. Thank you. Thank you.